Appeals No. 2015-1792 and 1793

United States Court of Appeals for the Federal Circuit

**AMERANTH, INC.,**
*Appellant*

v.

**AGILYSYS, INC., EXPEDIA, INC., FANDANGO, LLC, HOTEL TONIGHT, INC., HOTWIRE, INC., HOTELS.COM, L.P., KAYAK SOFTWARE CORPORATION, LIVE NATION ENTERTAINMENT, INC., ORACLE CORPORATION, ORBITZ, LLC, OPENTABLE, INC., PAPA JOHN'S USA, INC., STUBHUB, INC., TICKETMASTER, LLC, TRAVELOCITY.COM LLP, WANDERSPOT LLC, DOMINO'S PIZZA, INC., DOMINO'S PIZZA, LLC, MOBO SYSTEMS, INC., EVENTBRITE, INC., BEST WESTERN INTERNATIONAL, INC., HYATT CORPORATION, MARRIOTT INTERNATIONAL, INC., STARWOOD HOTELS & RESORTS WORLDWIDE INC., USABLENET, INC., APPLE, INC., HILTON RESORTS CORP., HILTON WORLDWIDE, INC., HILTON INTERNATIONAL CO.,**
*Appellees*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. CBM2014-00015 and CBM2014-00016

**Brief for Intervenor—Director of the
United States Patent and Trademark Office**

THOMAS W. KRAUSE
Acting Solicitor

SCOTT C. WEIDENFELLER
Acting Deputy Solicitor

JOSEPH MATAL
Associate Solicitor

Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the
United States Patent and Trademark Office*

October 27, 2015

# TABLE OF CONTENTS

I.     STATEMENT OF THE ISSUE....................................................1

II.    STATEMENT OF THE CASE................................................1

    A. The '325 and '850 Patents:  Updating Menus and Food Orders on a Computer………………………………………………………1

    B. The Board's Decision:  All of the Instituted Claims Are Unpatentable Under § 101………………………………………………….. …..6

        1. The Board Found that the Claims Recite the Use of Only Conventional Technology…………………………………………7
           a. Computers and Graphical User Interfaces……………………7
           b. Hierarchical Tree Structures…………………………………. 7
           c. Generating a Menu…………….……………………………8
           d. Transmitting the Second Menu to Another Device……..……..8
           e. Time and Type of Ordering………..……………………….8

III.    SUMMARY OF THE ARGUMENT ........................................9

IV.    ARGUMENT ...................................................................10

    A. Standard of Review……………………………………………… .10

    B. This Court Lacks Jurisdiction to Review the Board's Institution-Phase Decision that the Patents Do Not Claim a Technological Invention.... . . 11

        1. *In re Hiniker Co.* Bars Review of an Institution-Phase Decision that Overlaps With, and Is "Washed Clean" by, a Final Decision……………………………………………………... 11

        2. The Board's Preliminary "Technological Invention" Decision Overlaps With, and Was "Washed Clean" by, the Final Decision…………………………………………………..…… 12

    C. Because the Board Agreed with the Substance of Ameranth's Proposed Claim Constructions, Ameranth Can Identify No Error in the Board's Claim Constructions………………..…………………………...…17

i

1.  The Board Agreed that the Claims Require Downloading to Make  Data the Same Between Devices............................17

2.  The Board Agreed that Claim 1 Requires a Hierarchical Tree Structure.........................................…................. 18

D.  The Board Correctly Determined that the Claims Do Not Recite Patent-Eligible Subject Matter..............................................…..20

1.  The Board Correctly Determined that Ordering Food Is an Abstract  Human Activity............................................. 20

2.  The Board Reasonably Determined that the Claims Recite Only Conventional Computer Technology........................…....23

   a.  The Board Properly Applied Its Background Knowledge and Expertise to Find that the Recited Technology is Conventional..............................…..23
   b.  The Patents' Statements About the Prior Art, and Their Lack of an Alternative Enabling Disclosure, Provide Substantial Support for the Board's Conclusions that the Recited Technology Is Conventional.................................…....25

3.  Ameranth's Remaining Arguments Are Unavailing...............28

   a.  To the Extent that "Bi-Directional" Communication Differs from Synchronization, Ameranth's Argument Is Waived......................................................... 28
   b.  "Displayability" Is Implicitly Identified by the Specification as Conventional and Lacks an Enabling Disclosure..................................................... 29
   c.  Changing a Menu Based Upon Changing Circumstances Does Not Add "Significantly More"... 30

V.    CONCLUSION........................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Ahlert*, *In re*, 424 F.2d 1088, 1092 (CCPA 1970) ...................................................24

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)..................... *passim*

*Applied Materials, Inc.*, *In re*, 692 F.3d 1289 (Fed. Cir. 2012) ..............................16

*Baxter*, *In re*, 678 F.3d 1357 (Fed. Cir. 2012) ........................................................29

*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) ................ 23, 30, 31

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013) ...............23

*Cuozzo Speed Techs., LLC*, *In re*, 793 F.3d 1268 (Fed. Cir. 2015)................. 11, 15

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).............21

*Hiniker Co.*, *In re*, 150 F.3d 1362 (Fed. Cir. 1998)........................................ *passim*

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015). .................................................................. 20, 23

*Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343
    (Fed. Cir. 2015)........................................................................................... *passim*

*Jack Gutman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352 (Fed. Cir. 2002).......19

*Kappos v. Hyatt*, 132 S. Ct. 1700 (2012)...................................................................24

*Litecubes, LLC v. N. Light Products, Inc.*, 523 F.3d 1353 (Fed. Cir. 2008) ............10

*Moore*, *In re*, 444 F.2d 572 (CCPA 1971)...............................................................24

*OIP Techs. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015).........................23

*Power Integrations, Inc. v. Lee*, 797 F.3d 1318 (Fed. Cir. 2015)...........................19

*Trans Texas Holdings Corp.*, *In re*, 498 F.3d 1290 (Fed. Cir. 2007) ......................19

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014). .............. 21, 22, 23

*Versata Dev. Group, Inc. v. SAP America, Inc.*, 793 F.3d 1336
 (Fed. Cir. 2015)……………………………………………………………..10, 15

*WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) ...........................21

**Statutes**

35 U.S.C. § 6(a) ...................................................................................................24

35 U.S.C. § 101 ............................................................................................ *passim*

35 U.S.C. § 141(c) ...............................................................................................14

35 U.S.C. § 303(c) ...............................................................................................12

35 U.S.C. § 326(a)(5)............................................................................................14

35 U.S.C. § 326(a)(8), (12) ..................................................................................14

35 U.S.C. § 329......................................................................................................14

**Other Authorities**

http://www.uspto.gov/web/offices/pac/exam.htm#req. ...........................................24

Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 18(d)(1) (2011). ..........12

*USPTO Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,757
 (Aug. 14, 2012). ................................................................................................14

## STATEMENT OF RELATED CASES

The Director of the United States Patent and Trademark Office ("Director" and "USPTO") adopts by reference the statement of related cases of Ameranth, Inc. ("Ameranth") and Agilysys, Inc., *et al.* ("Agilysys"). As those statements note, this appeal has been designated as a companion case with appeals numbered 15-1703 and -1704. The patents in all of these appeals are from the same family and vary significantly only as to some of their dependent claims. The arguments made in this brief are almost all identical to those made in the Director's brief in appeals numbered 15-1703 and -1704. The claim-construction argument in section IV.C.1 of this brief, at pages 17-18, varies somewhat from the corresponding argument in the other brief, and the argument in section IV.D.3.c, at pages 30-31, addresses claims that are unique to one of the patents that is the subject of this appeal.

The Director is not aware of any other appeal in connection with this proceeding that has previously been before this or any other court, or of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

# I.    STATEMENT OF THE ISSUE

Under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), a patent claim directed to an abstract idea is not transformed into patentable subject matter merely because it recites implementation of the idea via conventional computer technology.  To confirm its understanding that a claim relies only on existing, conventional technology, this Court looks to statements made in the patent's specification, and whether that specification discloses any other means of implementing the invention.  Ameranth's patent specification describes only the use of existing technology and "commonly known" programming steps to implement its claimed business method.  The principal question on this appeal is whether the Patent Trial and Appeal Board ("Board") reasonably applied its knowledge and expertise to conclude that Ameranth's claims recite only conventional computer technology—where, as here, the patents fail to describe any non-prior art means for implementing the claimed invention.

# II.    STATEMENT OF THE CASE

## A. The '325 and '850 Patents:  Updating Menus and Food Orders on a Computer

Ameranth owns U.S. Patents Nos. 6,871,325 ("the '325 patent") and 6,384,850 ("the '850 patent") (collectively, "the patents"), which claim a computerized method and system for updating a menu and taking orders at a

1

restaurant.  A68-98.[1]  The patents' specification[2] notes that while computers have become ubiquitous, "pen and paper have prevailed in the hospitality industry, e.g., for restaurant ordering, reservations and wait-list management, because of their simplicity, ease of training and operational speed."  A75, col.1, ll.21-24; A90, col.1, ll.24-27.  To bring the advantages of computers to restaurants, the patents propose "a desktop software application that enables the rapid creation and building of a menu and provides a means to instantly download the menu configuration onto, e.g., a handheld device or Web page."  A76, col.3, ll.16-19; A91, col.3, ll.21-24.  This system allows a user to "seamlessly interface with standard point of sale ('POS') systems to enable automatic database updates and communication exchanges when a change or input occurs in any of the other system elements."  A76, col.3, ll.19-23; A91, col.3, ll.24-28.

To build a menu, the patents propose a graphical user interface that uses "[a] hierarchical tree structure."  A77, col.6, l.15; A92, col.6, l.25.  This

---

[1] Throughout this brief, pages of the Joint Appendix are cited as "A," and pages of Ameranth's opening brief are cited as "Am. Br."

[2] The '325 patent, along with the patent that is the subject of appeals number 15-1703 and 1704, is a child of the '850 patent.  The three patents share a specification that is almost entirely identical.

embodiment is illustrated in figure 1, which is reproduced below. The

hierarchical tree structure

> show[s] the different relationships between menu categories 3 (e.g.,
> soups, salads, appetizers, entrees, desserts, etc.), menu items 4 (e.g.,
> green salad, chicken caesar salad, etc.), menu modifiers 5 (e.g.,
> dressing, meat temperature, condiments, etc.) and menu sub-
> modifiers 6 (e.g., Italian, French, ranch, bleu cheese, etc.).

A77, col.6, ll.15-21; A92, col.6, l.25-31.



A69, figure 1; A84, figure 1.

The patents also note that they "provid[e] for the creation and storing of

different menu databases on handheld devices such as breakfast, lunch, or dinner

menus," thereby allowing the user to "select the appropriate database to reflect

3

the time of day." A79, col.10, ll.10-13; A94, col.10, ll.23-26. In addition, "the invention is equally applicable to table-based, drive-thru, internet, telephone, wireless or other modes of customer order entry." A81, col.14, ll.14-16; A96, col.14, ll.26-29.

Finally, the patents broadly note that they rely on existing technology to implement their invention. The specification states that "[t]he preferred embodiment of the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention." A77, col.5, ll.33-38; A92, col.5, ll.39-44. "The workstation hardware is configured by software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including internet browsing software) and application software components." A77, col.5, ll.44-47; A92, col.5, ll.50-53. These are "common [graphical user interface] operating system that provide [an] 'object oriented' environment for personal computers." A77, col.5, ll.12-13; A92, col.5, ll.7-8. Graphical user interfaces "allow users to manipulate their data." A76, col.4, l.67; A92, col.5, l.5. "The records of [a] file can be created, deleted, modified, and arranged in a drag-and-drop fashion as if they also were physical objects." A77, col.5, ll.4-6; A92, col.5, ll.8-10.

4

The specification also notes that "Windows CE® provides the benefits of a familiar Windows 95/98/NT® look and feel [and] built in synchronization between handheld devices, internet and desktop infrastructure." A79, col.10, l.65-A80, col.11, l.1; A95, col.11, ll.11-14. The specification indicates that "[t]he software applications for performing the functions falling within the described invention can be written in any commonly used computer language." A80, col.11, ll.43-45; A95, col.11, ll.56-68. "The discrete programming steps are commonly known and thus programming details are not necessary to a full description of the invention." A80, col.11, ll.45-48; A95, col.11, ll.58-61.

Claim 1 is illustrative of the claimed invention. It recites:

> 1. An information management and synchronous communications system for generating and transmitting menus comprising:
> a. a central processing unit,
> b. a data storage device connected to said central processing unit,
> c. an operating system including a graphical user interface,
> d. a first menu consisting of menu categories, said menu categories consisting of menu items, said first menu stored on said data storage device and displayable in a window of said graphical user interface in a hierarchical tree format,
> e. a modifier menu stored on said data storage device and displayable in a window of said graphical user interface,
> f. a sub-modifier menu stored on said data storage device and displayable in a window of said graphical user interface, and
> g. application software for generating a second menu from said first menu and transmitting said second menu to a wireless handheld computing device or Web page,
> wherein the application software facilitates the generation of the second menu by allowing selection of categories and items from the first menu, addition of menu categories to the second menu,

5

addition of menu items to the second menu and assignment of
parameters to items in the second menu using the graphical user
interface of said operating system, said parameters being selected
from the modifier and sub-modifier menus[, wherein said second
menu to applicable to a predetermined type of ordering].[3]

A81-82; A96-97.

## B. The Board's Decision:  All of the Instituted Claims Are Unpatentable Under § 101

Agilysys petitioned for Covered Business Method Review of the patents,

and the Board instituted review on claims 1-11 of the '850 patent and claims 1-

10 of the '325 patent under § 101 of title 35.  A1018-1045; A1046-1074.  After

briefing and an oral hearing, the Board entered a final written decision in which

it concluded that all of the claims on which review was instituted are

unpatentable.  A29; A65.

Applying the first step of the Supreme Court's *Alice* framework, the

Board concluded that all of the patents' claims "[are] directed to the abstract

idea of generating a second menu from a first menu and sending the second

menu to another location."  A19; A59.  The Board then applied step two of the

*Alice* test to the claims in a series of overlapping analyses.

---

[3] The bracketed text appears in claim 1 of the '325 patent, but not in
claim 1 of the '850 patent.

6

### 1. The Board Found that the Claims Recite the Use of Only Conventional Technology

#### a. Computers and Graphical User Interfaces

The Board noted that the claims recite a processor, a data storage device, and an operating system with a graphical user interface, among other elements. A20; A60.  The Board also noted that the patents' own specification describes processors and data storage devices as "typical hardware elements," and that it indicates that "the use of [graphical user interfaces], such as Microsoft Widows® and Window CE® for handheld device[s], were known, and that [graphical user interfaces] were a known means for allowing a user to manipulate data."  A20 (quoting A77, col. 5, ll.34-44; A76, col.4, l.59-A77, col.5, l.16); A60.  The Board concluded that "these claim elements require nothing more than a generic computer with generic computer elements performing generic computer functions" (A20; A60), and that "[u]sing a graphical user interface, a known way for a user to interact with a computer, does not change the generic nature of the computer."  A60.

#### b. Hierarchical Tree Structures

The Board noted that the claims recite displaying a menu in graphical user interface in a hierarchical tree format.  A21; A60.  Citing the specification's statement that such hierarchical displays are "conventional," the Board

7

concluded that this limitation does not impart patent eligibility to the claims.
A21; A60-61.

### c. Generating a Menu

The Board noted that the claims recite generating a second menu by modifying a first menu. A21; A61. The Board also noted that "[t]he Specification discloses that [graphical user interfaces] that display menus from which records can be created, deleted, modified, or arranged are conventional." A21; A61. The Board thus concluded that this limitation did not add "significantly more" to the claims' abstract idea. A21; A61.

### d. Transmitting the Second Menu to Another Device

The Board noted that the recited application software "also functions to transmit the second menu to a wireless handheld computing device or Web page." A21; 61. The Board cited the specification's statement that a menu is transmitted to another device by downloading the menu, and it found that downloading is conventional post-solution activity that does not impart patent eligibility to the claims. A21-22 (citing A78, col.8, ll.45-62; A76, col.3, ll.35-39; A77, col.6, ll.22-25; A78, col.7, l.12; A79, col.9, l.65-col.10, l.1); A61-62.

### e. Time and Type of Ordering

The Board noted that claim 1 of the '325 menu recites a second menu that is "applicable to a predetermined type of ordering" (A62), and claims 2-6 and 10, which depend from claim 1, recite "table-based customer ordering," "drive-

8

through customer ordering," "customer ordering via internet," "customer ordering via telephone," and "customer ordering via wireless device."  A64.  Independent claims 7 and 8 add the limitation that the second menu is "appropriate for a specified time of day"—*i.e.*, is a breakfast, lunch or dinner menu.  A62.  The Board concluded that all of these limitations amount only to "insignificant extra solution activity."  A62; A64-65.

## III.    SUMMARY OF THE ARGUMENT

Because in this case, the Board's institution-phase "technological invention" decision will effectively be reevaluated by this Court on its review of the Board's final written decision, this Court lacks jurisdiction to separately review the institution decision.  The Court's review of the underlying issue— whether the recited technologies are conventional and obvious— is limited to the conclusion reached by the Board in its final written decision, which is made on a more complete record.  If that final decision is correct, any error in the institution decision was "washed clean" by the final written decision, and there is no need to review the institution decision because it is clear that a sufficient petition could have been presented.

The Board correctly applied the two steps of the *Alice* analysis.  It properly concluded that ordering food at a restaurant is an abstract human activity.  And the Board reasonably applied its background knowledge and

9

expertise—just as courts have done—to conclude that the recited technological limitations, such as "synchronizing" data and using "graphical user interfaces" with "hierarchical tree formats," are routine and conventional. The Board's conclusions are confirmed by the specification's own admissions that the recited technologies are conventional, and by the specification's failure to describe any non-prior art means for implementing the technologies.

Ameranth purports to dispute the Board's claim constructions, but the alternative limitations that it urges are either interchangeable with, or actually identical to, the constructions adopted by the Board. The Board appropriately employed constructions that track the actual words of the claims, rather than adopting new terms with unspecified meanings.

## IV.   ARGUMENT

### A. Standard of Review

This Court reviews its own jurisdiction de novo. *See Litecubes, LLC v. N. Light Products, Inc.*, 523 F.3d 1353, 1360 (Fed. Cir. 2008). The Board's § 101 analysis is reviewed for legal error, while its underlying factual findings are reviewed for substantial evidence. *See Versata Dev. Group, Inc. v. SAP America, Inc. ("Versata II")*, 793 F.3d 1306, 1336 (2015).

**B. This Court Lacks Jurisdiction to Review the Board's Institution-Phase Decision that the Patents Do Not Claim a "Technological Invention"**

**1. *In re Hiniker Co.* Bars Review of an Institution-Phase Decision that Overlaps With, and Is "Washed Clean" by, a Final Decision**

*In re Hiniker Co.*, 150 F.3d 1362 (Fed. Cir. 1998), held that when this Court's direct review of a USPTO post-issuance proceeding is limited to the Board's final decision, the Court lacks jurisdiction over a preliminary decision to commence the proceeding that overlaps with the Board's final decision. *See id.* at 1367. *Hiniker* involved the reexamination statute, which requires a requester to present a substantial "new" question of patentability. *See id.*; *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1273-74 (Fed. Cir. 2015). The requester in that case relied on previously-considered art to start the proceeding, but the Board's final decision cited new art. *See Hiniker*, 150 F.3d at 1367; *Cuozzo*, 793 F.3d at 1274. *Hiniker* held that the Court's review was limited to the Board's final decision, and did not encompass the preliminary decisions to order the proceeding. *See Hiniker*, 150 F.3d at 1367.

The *Hiniker* Court reasoned that the error in the preliminary decision to order the proceeding was "washed clean" by the proceeding itself, which resulted in a final decision that was subject to this Court's full review. *Id.* Thus under *Hiniker*, even "a flawed decision to institute . . . [a proceeding] [i]s not a basis for setting aside a final decision." *Cuozzo*, 793 F.3d at 1273-74. Where

11

such a preliminary question overlaps with and merges into the final decision,

this Court's jurisdiction is "only over [the] appeal from the final decision of the

Board." *Id.* (quoting *Hiniker*, 150 F.3d at 1367). Moreover, this doctrine

applies independently of, and in addition to the limitations of, any statutory bar

on review of the decision to initiate a proceeding. *See id.* at 1273, n.3 (noting

that 35 U.S.C. § 303(c) only bars review of a decision *not* to order a

reexamination).

### 2. The Board's Preliminary "Technological Invention" Decision Overlaps With, and Was "Washed Clean" by, the Final Decision

CBM review is limited to patents with claims that are not directed to a

"technological invention." Leahy-Smith America Invents Act, Pub. L. No. 112-

29, § 18(d)(1) (2011). To determine whether a claim is directed to a

technological invention, the Board considers "whether the claimed subject

matter as a whole recites a technological feature that is novel and unobvious

over the prior art," and whether it "solves a technical problem using a technical

solution." 37 C.F.R. § 42.301(b). This inquiry substantially overlaps with a

§ 103 obviousness analysis—as well as with step two of the *Alice* framework.

Courts applying step two of *Alice* "have found guidance in deciding whether the

allegedly abstract idea (or other excluded category) is indeed known,

conventional, and routine, or contains an inventive concept, by drawing on the

rules of patentability." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d

1343, 1347 (Fed. Cir. 2015); *see also id.* at 1346 ("[d]etermination of what is an inventive concept favors inquiries analogous to those undertaken for determination of patentable invention").

The Director does not contend that a proper institution-phase decision that a patent is for a non-technological invention dictates a finding that a claim of the patent is invalid. This case, however, involves a heavy overlap between the CBM institution decision and the final decision on the merits. In its challenge to the Board's institution decision, Ameranth makes the same arguments that it also makes in its challenge to the Board's final patentability determination. It makes the same arguments in both phases regarding the claim limitations of "synchronization" (*compare* Am. Br. at 18-19, 21, 23 *with id.* at 29-30, 31-32, 33, 34, 41), it makes the same arguments with respect to the "hierarchical menus" (*compare* Am. Br. at 21 and 22 *with id.* at 25-28), and it makes the same arguments with respect to "displayability." *Compare* Am. Br. at 18, 19, and 22-23 *with id.* at 38-40, 42-43, 50 n.34). As Ameranth itself notes, its institution-phase challenge is inextricably "intertwined" with an obviousness inquiry

(Am. Br. at 20 n.14)—which itself is "analogous" to the *Alice* step two inquiry. *Internet Patents*, 790 F.3d 1347.[4]

As was the case with the reexamination statute in *Hiniker*, the CBM statute directs this Court's review to the Board's final decision on the merits. *See* 35 U.S.C. § 329; 35 U.S.C. § 141(c); *Hiniker*, 150 F.3d at 1367.  Because the Board's final written decision reevaluates the same issue that is decided in the institution-phase "technological invention" inquiry, any error in that preliminary institution inquiry is "washed clean" by the final written decision, *Hiniker*, 150 F.3d at 1367, and the institution decision is thus not subject to further review.  *See id.*

Two unique features of CBM review make application of the *Hiniker* doctrine particularly appropriate to these proceedings.  Unlike in a reexamination proceeding, the patent owner and the challenger in a CBM review are entitled to post-institution discovery.  *See* 35 U.S.C. § 326(a)(5).  Each is entitled, for example, to depose the other's declarants.  *See id.*; *USPTO Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,757 (Aug. 14, 2012).  This additional evidence is then considered in the parties' post-institution response

---

[4] The overlap in the two inquiries also is reflected in Ameranth's argument that "the Board erred on technological invention, and this error applied equally to the incorrect conclusion on § 101" (Am. Br. at 12), and its repeated insistence that the Board's final written decision demonstrates error in the institution decision.  Am. Br. at 4 n.4, 9, 11, 18, 36.

and reply.  *See* 35 U.S.C. § 326(a)(8), (12).  Thus the very structure of CBM review contemplates that the institution decision is truly only preliminary, and that the final decision on the merits will be made on a more complete record.  If the Board's final written decision was in error, Ameranth will still obtain the relief that it seeks:  reversal of the Board and restoration of its claims.  And if the Board's final decision was correct, there is no need to relitigate the preliminary decision to institute the proceeding, because "[a] proper petition undisputedly could have" presented a meritorious case.  *Versata II*, 793 F.3d at 1322; *see also Cuozzo*, 793 F.3d at 1274 ("[t]he fact that the petition was defective is irrelevant because a proper petition could have been drafted").

Additionally, this Court has held that the USPTO is entitled to "substantial deference" in its application of the regulations defining the scope of CBM Review.  *Versata II*, 793 F.3d at 1325.  But while the Board thus receives deference in its institution-phase "technological invention" determination, it receives no deference for its legal interpretation of the *Alice* framework in a final written decision.  *See id.* at 1336.  Conducting back-to-back review of both the "technological invention" question and the *Alice* step two inquiry under their different review standards in the same proceeding thus creates the possibility that the same evidence will require affirmance of the Board's answer to the same question in one part of the proceeding—and reversal in another.

15

Precluding review of preliminary questions that are considered again in the Board's final written decision avoids such awkward results.

Finally, to the extent that this Court disagrees with the Director and concludes that the Board's institution-phase "technological invention" determination is reviewable independently of the Board's final merits decision, the Director contends that the patents fail to recite a technological invention (and are thus eligible for CBM review) for the same reasons that they fail to satisfy step two of the *Alice* framework (and are ineligible for patenting), as presented in the next sections of this brief.

In its challenge to the Board's institution decision, Ameranth also cites what it characterizes as "voluminous objective evidence of non-obviousness." Am. Br. at 20.[5]  In order for such evidence to demonstrate nonobviousness, the patentee must show a nexus between these objective indicia and "the unique characteristics of the claimed invention."  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1299 (Fed. Cir. 2012).  Because Ameranth does not cite *any* feature of the claimed invention in its argument, it fails to show that its secondary evidence has a nexus to patentable features of the claimed invention.  *See id.*

_____

[5] Ameranth does not cite this type of evidence in its challenge to the Board's final written decision.

**C. Because the Board Agreed with the Substance of Ameranth's Proposed Claim Constructions, Ameranth Can Identify No Error in the Board's Claim Constructions**

**1. The Board Agreed that the Claims Require Downloading to Make Data the Same Between Devices**

Ameranth argues that the Board erred by failing to read the claim preamble's reference to "synchronization" as limiting, and that it erred by failing to define "central processing unit" as a device that provides "synchronized" menus across different devices. Am. Br. at 29-35. Ameranth contends that "synchronized" means "maintaining consistency of, *e.g.*, menus" between different devices. Am. Br. at 29; *see also id.* at 33 ("synchronization is providing consistency between different components of the system").

The Board concluded that the claims' "preamble is non-limiting because it does not recite any structural components not already captured in the body of the claim." A10; A43. It found that the body of the claim "recite[s] a structurally complete invention" that is "described in the Specification:" a menu is modified and then "the updated menu is downloaded to a connected handheld device." A9-10; A42. As a result, "the updated menu is the same on the desktop PC and the handheld device." A10; A42. The Board also noted its agreement with Ameranth's statement during the oral hearing that "downloading is synchronizing, as 'it's making something the same with something else.'" A10; A42.

17

The Board thus agreed with the substance of Ameranth's proposed claim constructions:  it agreed that the claims require downloading menus so that they are the same between different computerized devices.  Although the Board did not rely on the preamble or the term "central processing unit" to import these meanings, it nevertheless made clear that it understood the claims to require that "the updated menu is downloaded to" another device such that the menu "is the same on the desktop PC and" the other device.  A10; A42.  Because Ameranth does not identify any material difference between its claim interpretation and the Board's claim interpretation, it cannot identify any reversible error in the Board's interpretation.

### 2.  The Board Agreed that Claim 1 Requires a Hierarchical Tree Structure

Ameranth contends that the Board erroneously concluded that the claims do not require menus displayed in a hierarchical tree format.  Am. Br. at 24-29. The Board made clear, however, that it construed the claims recite a "first menu [that] is displayable in a hierarchical tree format."  A21; A60.  The Board then analyzed whether displaying menus in a hierarchical tree format is more than routine or conventional activity, and concluded that it is not.  A21; A60-61.

Ameranth faults the Board's conclusion that claim 1 does not include a "linked levels" feature or "multi-tiered levels of components."  Am. Br. at 25 (citing A14).  The Board adopted the construction "hierarchical" because the

claims actually use the term "hierarchical tree format" (A81, col.14, ll.59-60; A97, col.15, ll.4-5; *id.* at ll.46-47; A97, col.16, ll.12-13), but do not employ the terms "linked levels" or "multi-tiered components."  Nor does Ameranth point to any difference in meaning between "hierarchical tree format" and the terms "linked levels" or "multi-tiered components."  Indeed, Ameranth itself treats the terms as interchangeable.  *See, e.g.*, Am. Br. at 25 (citing "the requirement that menus as claimed are hierarchical, *i.e.*, including 'linked levels' of options").  Because Ameranth apparently agrees that these terms mean the same thing, it can identify no reversible error in the Board's decision to employ the term "hierarchical" (the actual language of the claim) rather than the terms "linked levels" or "multi-tiered components."

Finally, Ameranth alleges that the Board erred by failing to consider claim constructions previously adopted by a district court.  Am. Br. at 24, 25 n.19.  The Board did, however, consider the district court's claim constructions.  *See*

A7-8; A40.[6]  In addition, Ameranth fails to explain how the district court's claim

constructions differ in substance from those made by the Board—much less

explain how any such differences led to reversible error.

### D. The Board Correctly Determined that the Claims Do Not Recite Patent-Eligible Subject Matter

#### 1. The Board Correctly Determined that Ordering Food Is an Abstract Human Activity

Applying step one of the Supreme Court's *Alice* framework, the Board

concluded that the patents' claims "are directed to the abstract idea of generating

a second menu from a first menu and sending the second menu to another

location." A19; A59.  Ameranth does not dispute that ordering food at a

restaurant is one of those quintessentially human activities that is abstract "as

[the Supreme Court] ha[s] used that term." *Alice Corp. Pty. Ltd. v. CLS Bank

Int'l*, 134 S. Ct. 2347, 2357 (2014).  This Court recently catalogued its own

cases applying *Alice*, and noted that the abstract-idea category has been found to

---

[6] Although the Board must consider district-court claim constructions that are asserted before it by the parties, "[t]here is no dispute that the [B]oard is not generally bound by a prior judicial construction of a claim term." *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015); *see also In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1297 (Fed. Cir. 2007) (noting that "[i]ssue preclusion [against the PTO] is not warranted . . . [when] the PTO was not a party to the earlier litigation").  Nor would binding the Board to previous district-court claim constructions appropriately account for the Board's often superior understanding of a technology.  *Cf. Jack Gutman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (noting that the district court itself may "revisit[] and alter[] its interpretation of the claim terms as its understanding of the technology evolves").

encompass methods of credit verification and management, tax reduction

strategies, generating lists of tasks to be performed, carrying out commercial

transactions, and gambling. *See Intellectual Ventures I LLC v. Capital One*

*Bank (USA)*, 792 F.3d 1363, 1368 n.2 (Fed. Cir. 2015). Like generating lists of

tasks, generating menus to facilitate ordering food "is not meaningfully different

from the ideas found to be abstract" in other cases "involving methods of

organizing human activity." *Id.* at 1367.

Before the Board, Ameranth argued that the patents constitute far less of a

business-method patent than that upheld by this Court in its decision

*Ultramercial, LLC v. Hulu, LLC*, 722 F.3d 1335, 1350 (Fed. Cir. 2013)

("*Ultramercial II*"), *vacated and remanded*, *WildTangent, Inc. v. Ultramercial,*

*LLC*, 134 S. Ct. 2870 (2014). A1201; A1294. Ameranth contended that

*Ultramercial II* requires a "focus on the transformation of a general purpose

computer into a special purpose computer via programming to perform

particular functions." A1201; A1294-95. Ameranth reprises the argument in

this Court, contending that its invention is not abstract because "the claimed

application software does not simply 'organize' data differently, but rather

transforms it into new and different uses," and "the constituents of menus . . .

are themselves physical objects." Am. Br. at 55; *see also id.* at 36.

21

This Court has made clear, however, that "not all transformations or machine implementations infuse an otherwise ineligible claim with an inventive concept." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (citation omitted).  In particular, "recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible"—"[t]he bare fact that a computer exists in the physical rather than purely conceptual realm is 'beside the point.'" *Id.* (quoting *Alice*, 134 S. Ct. at 2358).  In its subsequent and final decision in the *Ultramercial* litigation, this Court also made clear that "[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the [patent-eligibility] analysis." *Ultramercial, Inc. v. Hulu, LLC ("Ultramercial III")*, 772 F.3d 709, 717 (Fed. Cir. 2014).

The mere fact that the claimed invention uses a computer to transform and transfer data is insufficient to remove the claims from the realm of abstract ideas.  To the extent that Ameranth contends that the claims' recited "synchronization" is more than generic computer use and thus imparts patent eligibility (Am. Br. at 36-37), that argument is considered in the next section, which addresses step two of the *Alice* test. *See Ultramercial III*, 772 F.3d at 715 ("any novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis").

## 2. The Board Reasonably Determined that the Claims Recite Only Conventional Computer Technology

### a. The Board Properly Applied Its Background Knowledge and Expertise to Find that the Recited Technology Is Conventional

The Board found that the disputed claim limitations—computers and graphical user interfaces, hierarchical tree structures, and transmitting a menu—recite only the use of routine and conventional computer technology.  A20-22; A60-62.

The Board appropriately employed its own background knowledge and expertise to apply step two of the *Alice* framework.  Courts conducting the *Alice* analysis routinely rely on the common knowledge that some computer functions are generic.  In *Alice Corp.* itself, the Supreme Court cited this Court's notice of the "ubiquity of computers," *Alice*, 134 S. Ct. at 2358 (citing *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (Lourie, J., concurring))—and took its own judicial notice of the fact that "the use of a computer to obtain data, adjust account balances, and issue automated instructions" are "well-understood, routine, [and] conventional" functions of computers.  *Id.* at 2359.

This Court, too, relies on its own background knowledge to identify those computer functions that are routine and conventional.  *See, e.g.*, *OIP Techs. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (finding that sending

and storing data and estimating values on a computer are all "well-understood, routine, [and] conventional activities") (quoting *Alice*, 134 S. Ct. at 2359); *Intellectual Ventures*, 792 F.3d at 1370 (noting that an "interactive interface" limitation "simply describes a generic web server with attendant software" and is a "generic computer element").[7]

Finally, the Patent Trial and Appeal Board is particularly suited to applying its own expertise to identify those computer functions that are conventional and generic. The Patent Act expressly provides that "administrative patent judges shall be persons of competent legal knowledge and scientific ability," 35 U.S.C. § 6(a), and USPTO rules specify that the examining corps must have a scientific education.[8] Given these requirements, it is unsurprising that courts have recognized the technical expertise of the USPTO's examiners and administrative patent judges. *See, e.g., Kappos v. Hyatt*, 132

---

[7] *See also Ultramercial III*, 772 F.3d at 717 ("[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the [*Alice*] analysis"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("[t]hat a computer receives and sends [particular] information over a network—with no further specification—is not even arguably inventive").

[8] *See* http://www.uspto.gov/web/offices/pac/exam.htm#req.

S. Ct. 1690, 1700 (2012) (noting that "the PTO has special expertise in evaluating patent applications").[9]

The Board thus appropriately exercised its own judgment to identify those computer operations that are routine and conventional within the meaning of step two of the *Alice* framework.  The next section discusses additional factors that confirm the reasonableness of the Board's findings.

### b. The Patents' Statements About the Prior Art, and Their Lack of an Alternative Enabling Disclosure, Provide Substantial Support for the Board's Conclusions that the Recited Technology Is Conventional

The patents' specification states that "[t]he preferred embodiment of the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention."  A77, col.5, ll.33-38; A92, col.5, ll.39-44.  It states that "[t]he workstation hardware is configured by software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including internet browsing software) and application software components."  A77, col.5, ll.44-47;

---

[9] *See also In re Moore*, 444 F.2d 572, 574 (CCPA 1971) (acknowledging "the technical expertise of the individual members of the [now Patent Trial and Appeal] [B]oard in making findings of technical fact based upon their own knowledge and experience"); *In re Ahlert*, 424 F.2d 1088, 1092 (CCPA 1970) (noting the "specialized technical expertise of Patent Office examiners").

A92, col.5, ll.50-53.  The specification also notes that the "[t]he software

applications for performing the functions falling within the described invention

can be written in any commonly used computer language," and that "[t]he

discrete programming steps are commonly known and thus programming details

are not necessary to a full description of the invention."  A80, col.11, ll.43-48;

A95, col.11, ll.56-61.

Ameranth contends that generating hierarchical menus and transmitting

them to handheld and other devices are not conventional functions of pre-

existing technology.  Am. Br. at 47.  The patents' own specification, however,

provides substantial support for the Board's conclusion that generating

hierarchical menus—selecting and adding menu categories and assigning

parameters to items—are conventional activities.  A21; A60-61.  The

specification notes that "the use of menus is conventional in [graphical user

interfaces]," and that such a menu system "comprises cascading sets of menus

which are displayable in context to show the parent/child relationships between

options of the context menu."  A77, col.5, l.17, ll.28-31; A92, col.5, l.22, ll.34-

37.  The specification describes prior-art Windows® operating systems as

"common [graphical user interface] operating systems that provide [an] 'object

oriented' environment for personal computers."  A77, col.5, ll.7-8; A92, col.5,

ll.12-13.  It notes that these graphical user interfaces "allow users to manipulate

their data as they would physical entities." A76, col.4, l.67-A77, col.5, l.1; A92, col.5, ll.5-6. "For example, a window can represent a file and the contents of the window can represent the records of the file." A77, col.5, ll.1-2; A92, col.5, ll.6-7. "The records of the file can be created, deleted, modified, and arranged in a drag-and-drop fashion as if they also were physical objects." A77, col.5, ll.4-6; A92, col.5, ll.9-11. Finally, the specification notes that "[t]he discrete programming steps" for implementing the invention "are commonly known and thus programming details are not necessary to a full description of the invention." A80, col.11, ll.43-48; A95, col.11, ll.56-61.

The patent's specification also provides support for the Board's conclusion that transmission and synchronization of data are conventional computer functions. A21-22; A61-62. The specification notes that "Windows CE® provides . . . built in synchronization between handheld devices, internet and desktop infrastructure." A79, col.10, l.65-A80, col.11, l.1; A95, col.11, ll.11-14.

The Board was entitled to rely on the specification's characterization of the prior art. This Court, too, has relied on a patent specification's statements that particular computer functionality is "conventional," "well-known," and "common" when applying step two of the *Alice* framework. *Internet Patents*, 790 F.3d at 1348.

The patents' failure to describe any non-prior art means for carrying out "menu generation" and data synchronization also supports the Board's conclusion that these are routine computer operations.  This Court has noted that when a patent "describes [a technological] effect or result dissociated from any method by which [the result] is accomplished," this reinforces the conclusion that the claim is directed to an abstract idea rather than to eligible subject matter. *Internet Patents*, 790 F.3d at 1348.  The Board's conclusion that the patents' recited computer functions are routine and conventional is thus reasonably supported where, as here, the patents' own specification confirms that they rely on existing technology and "commonly known" programming techniques, and the specification discloses no other means for executing their computerized functions.

### 3.  Ameranth's Remaining Arguments Are Unavailing

#### a.  To the Extent that "Bi-Directional" Communication Differs from Synchronization, Ameranth's Argument Is Waived

The Board found that the patents' claims require "transmit[ting]" menus between devices.  A21; A61.  It noted that the specification discloses that "the menu is transmitted to the wireless handheld device and Web page by downloading" (A21-22 (citing A78, col.8, ll.45-63); A61 (citing A93, col.8, l.65-col.9, l.3)), and concluded that "[s]uch downloading is merely a conventional post-solution activity."  A22; A62.  Ameranth asserts that the

Board erred because it only found that data is communicated in one direction, and that the claimed invention requires data to be transmitted in both directions. Am. Br. at 37, 44, 45, 51 n.35.

Ameranth's claims use the term "transmitting" or "transmitted," not the words "both directions" or "bi-directional." A82, col.15, ll.2, 21, 25; A97, col.15, ll.14, 56; A98, col.18, ll.21, 55. In addition, to the extent that Ameranth contends that "bi-directional" or "both directions" communication means something other than transmitting menus and making them the same, the argument was never presented in Ameranth's patent owner response in the proceedings below, and is thus now waived. *See In re Baxter*, 678 F.3d 1357, 1362 (Fed. Cir. 2012).

### b. "Displayability" Is Implicitly Identified by the Specification as Conventional and Lacks an Enabling Disclosure

Ameranth contends that its technology is not conventional because it requires that a transmitted menu be "displayable" on the receiving device. Am. Br. at 39-40, 42-43. In the proceedings below, Ameranth argued that displayability on the second device is implicit—that it is "clear from the structure of the claims," because without displayability, "there would be no way to make a selection therefrom." A1169-70; A1262-63 (emphasis in original). This may be so, but if displayability is implicit in the claims' recited selection function, it is also implicit in the prior art's disclosure of the same function.

Ameranth cannot contend that the claims' recitation of selecting and modifying items from a menu implies "displayability," but that the prior art's disclosure that "[t]he records of [a] file can be created, deleted, modified, and arranged in a drag-and drop fashion" (A77, col.5, ll.4-6; A92, col.5, ll.8-10), does not imply the same thing. Nor does Ameranth identify any place in the specification that describes how to enable the "displayability" function other than through prior-art technology. To the extent that "displayability" on a second device is claimed, the Board reasonably concluded that it is an implicit feature of conventional technology that allows synchronization of data between computer devices.

### c. Changing a Menu Based Upon Changing Circumstances Does Not Add "Significantly More"

Claims 2 through 10 of the '325 patent include the limitations that a menu is either suitable for a particular time of day—*i.e.*, breakfast, lunch, or dinner—or appropriate for a particular type of ordering, such as table-based ordering or drive-through ordering. A97. The Board concluded that these limitations are no more than "insignificant extra solution activity" and do not impart patent eligibility. A62; A64-65. Ameranth contends that the Board erred. Am. Br. at 57-58.

This Court has made clear that when claims are directed to an abstract idea, further limiting a claim "to a particular technological environment" is

insufficient to preserve the claim. *buySAFE*, 765 F.3d at 1355 (quoting *Alice*, 134 S. Ct. at 2358). Also, narrowing the abstract idea with other abstract ideas "does not make the idea non-abstract for section 101 purposes." *Id.* The *buySAFE* Court invalidated claims that were directed to the abstract idea of creating contractual relationships. *See id.* at 1354-55. The Court concluded that "[t]he dependent claims' narrowing to particular types of such relationships, themselves familiar, does not change the analysis." *Id.* at 1355.

The '325 patents' dependent claims' additional recitation of types of ordering, such as table-based or drive-through, merely limits the claims to a particular technological environment and does not change the § 101 analysis. And breakfast, lunch, and dinner are familiar human concepts whose recitation is insufficient to impart patent eligibility.

## V. CONCLUSION

For the foregoing reasons, this Court should affirm the Board's conclusion that all of the instituted claims recite ineligible subject matter.

Respectfully submitted,

October 27, 2015

/s/Joseph Matal
_____

Thomas W. Krause
Acting Solicitor

Scott C. Weidenfeller
Acting Deputy Solicitor

Joseph Matal
Associate Solicitor

Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450

*Attorneys for the Director of the
United States Patent and
Trademark Office*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2015, I electronically filed the

foregoing BRIEF FOR INTERVENOR—DIRECTOR OF THE UNITED

STATES PATENT AND TRADEMARK OFFICE using the Court's CM/ECF

filing system.  Counsel for appellant and appellee were electronically served by

and through the Court's CM/EMF filing system per Fed. R. App. 25 and Fed.

Cir. R. 25(a) and 25(b).


　　　　　　　　　　　　 /s/ Joseph Matal
　　　　　　　　　　　　_____
　　　　　　　　　　　　Joseph Matal
　　　　　　　　　　　　Associate Solicitor

## <u>RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE</u>

I certify pursuant to Fed. R. App. Proc. 32(a)(7) that the foregoing BRIEF

FOR INTERVENOR—DIRECTOR OF THE UNITED STATES PATENT

AND TRADEMARK OFFICE complies with the type-volume limitation

required by the Court's rule.  The total number of words in the foregoing brief is

7,921 words as calculated using the Word® software program.


/s/ Joseph Matal
_____
Joseph Matal
Associate Solicitor